FILED
2020 Dec-28  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 5:17-cv-02132-HNJ |
| | ) | |
| ALABAMA PAIN CENTER, LLC, et al., | ) | |
| | ) | |
| Defendants | ) | |

## **MEMORANDUM OPINION AND ORDER**

This diversity action proceeds before the court on Defendants' Motion for Judgment on the Pleadings on their Second and Fourth Defenses for lack of standing and lack of subject matter jurisdiction.  (Doc. 113).   In this civil action, Hartford claims Defendants misrepresented the amount of medication it dispensed to certain patients, resulting in Hartford's overpayment on reimbursements it tendered on workers' compensation insurance claims.   The record reveals the existence of disputed issues of fact as to whether Hartford constituted the payor on the reimbursements, which incites concerns whether Hartford suffered an injury pursuant to the constitutional standing doctrine, and whether it possesses legal rights and interests as to the prudential standing doctrine.   Therefore, based on the analyses herein, the court **DENIES** Defendants' motion.

## PROCEDURAL POSTURE

A party may move for judgment on the pleadings only after the pleadings have closed.  *See* Fed. R. Civ. P. 12(c).  Under the typical scenario, "[j]udgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts."  *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 965 (11th Cir. 2014) (internal citation omitted).  In determining whether a defendant is entitled to judgment on the pleadings, courts must "accept all the facts in the complaint as true and view them in the light most favorable to the non-moving party."  *Id.*  If comparison of the averments in the pleadings reveals a material dispute of fact, the court must deny judgment on the pleadings.  *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

However, Rule 12(c) also may serve as a vehicle for asserting a Rule 12(b) motion to dismiss after pleadings have closed.  *See Jiles v. United Parcel Serv., Inc.*, No. 308CV01192J25MCR, 2010 WL 11519465, at *2 (M.D. Fla. May 12, 2010), *aff'd*, 413 F. App'x 173 (11th Cir. 2011) ("Rule 12(c) is also a vehicle by which litigants may, after the pleadings are closed, assert a 12(b)(6) motion for their opponent's failure to state a claim upon which relief can be granted.") (citation omitted); *Gold v. Markham*, No. 98-7036-CIV, 1998 WL 1118629, at *1 (S.D. Fla. Dec. 2, 1998) ("Although Markam styles his motion as one for judgment on the pleadings, the crux of his arguments is that the Tax

2

Injunction Act, 29 U.S.C. § 1341, and principles of comity bar federal subject matter jurisdiction over this controversy.   Therefore, the Court considers Markam's motion to be brought pursuant to Federal Rule of Civil Procedure 12(b)(1) rather than 12(c)."); 5C Charles Alan Wright, Arthur R. Miller & May Kay Kane, Federal Practice and Procedure § 1367 (3d ed. 1995) (Rule 12(c) may serve "as an auxiliary device that enables a party to assert certain procedural defenses after the close of the pleadings"); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

When a party raises subject matter jurisdiction challenges pursuant to Rule 12(c), the court will apply the same standards that govern a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1).   *U.S. ex rel. Powell v. Am. InterContinental Univ., Inc.*, No. 1:08-CV-2277-RWS, 2012 WL 2885356, at *3 (N.D. Ga. July 12, 2012) (citing *Dorsey v. Georgia Dep't of State Rd. & Tollway Auth. SRTA,* No. CIV.A. 1:09-CV-1182, 2009 WL 2477565, at *3 n. 1 (N.D. Ga. Aug. 10, 2009) (in turn citing 5C Charles Alan Wright, Arthur R. Miller & May Kay Kane, Federal Practice and Procedure § 1367 (3d ed. 1995))) ("While the Court will operate under Rule 12(c), the Rule 12(b)(1) standards apply to this construed 12(c) motion.").

"Federal courts are courts of limited jurisdiction" and, as such, possess the power to hear cases only as authorized by the Constitution or United States' laws. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).   "[B]ecause a federal court is

powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss a case for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Plaintiff bears the burden of persuasion on establishing the court's subject matter jurisdiction. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

## BACKGROUND

Plaintiff, Hartford Fire Insurance Company (Hartford), filed suit against Alabama Pain Center, LLC (APC), and Covenant Pain Therapies Center, LLC (Covenant), asserting causes of action for fraud, unjust enrichment, money paid by mistake, rescission, and successor liability. Hartford's Amended Complaint alleges Hartford issued worker's compensation policies covering patients who received pain management treatment from APC and Covenant. After providing treatment to a covered patient, APC and Covenant would submit an HCFA 1500 form to Hartford requesting reimbursement for covered expenses. Each form contained representations regarding the volume of medication dispensed to the patient, and Hartford determined the amount of reimbursement due based upon those representations.

Hartford claims that APC misrepresented the amounts of medication it dispensed to three patients between July 8, 2012, and February 8, 2016, resulting in Hartford overpaying APC a total of $503,006.56.   Hartford also claims that Covenant rendered similar misrepresentations regarding the same three patients between May 18, 2017, and October 8, 2017, resulting in an overpayment of $14,788.99.   APC and Covenant deny fostering any misrepresentations, and they refuse to reimburse Hartford for the alleged overpayments.   Hartford claims that Covenant, as APC's successor-in-interest, bears liability for all amounts APC owes.   (*See* Doc. 21.)

APC and Covenant both answered Hartford's Amended Complaint, and both Defendants asserted affirmative defenses for lack of standing and lack of subject matter jurisdiction.   (Doc. 22, at 18; Doc. 29, at 12-13).   Defendants' motion requests the court enter judgment on the pleadings in their favor on those affirmative defenses.

Because the court applies the standards of Rule 12(b)(1) to Defendants' motion for judgment on the pleadings regarding the constitutional standing issue, and because the motion raises a factual challenge to this court's subject matter jurisdiction, Defendants presented evidence to support their arguments.   On August 19, 2020, Thomas Leonard Snow, III, provided deposition testimony as Hartford's Rule 30(b)(6) corporate representative. (Docs. 113-1, at 113-2).   *See* Fed. R. Civ. P. 30(b)(6) ("In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe

5

with reasonable particularity the matters for examination.  The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify.").  The notice of Snow's deposition specified the following topics for examination:

> 1. Hartford's relationship with Qmedworx Services, QmedTrix Services, Inc.[,] Mitchell International, Inc., Express Scripts Workers Compensation, Conduent, and/or any other third party administrator or third party in any way related to the claims in the Amended Complaint.

> 2. The negotiations for final payment on services rendered to the patients at issue in Hartford's Amended Complaint.

> 3. Hartford's financial books, corporate structure, records, statements, reports, and/or payments that in any way evidence Hartford overpaying for medications administered by APC or Covenant to the patients at issue in the Amended Complaint.

> 4. Communications with APC or Covenant regarding the patients at issue in the Amended Complaint.

> 5. The $503,006.56 in alleged overpayments made to APC from 2012 to present as alleged in the Amended Complaint.

> 6. The $14,788.99 in alleged overpayments made to Covenant from 2017 to present as alleged in the Amended Complaint.

> 7. Communications between Hartford and any third party related to the claims in the Amended Complaint.

> 8. The worker's compensation benefits provided to the individuals at issue in the Amended Complaint.

9.     Hartford's policies and procedures for administering payment for worker's compensation benefits.[1]

10.    The audits, whether performed by [a] third party or Hartford, referenced in the Amended Complaint.

. . . .[2]

12.    Hartford's communications regarding this litigation to individuals other than Hartford's counsel of record.

13.    Hartford's relationship with APC and/or Covenant.

14.    Any and all damages Hartford contends it is entitled to in this lawsuit.

15.    The allegations contained in Hartford's Amended Complaint against APC and/or Covenant.[3]

16.    Hartford's responses to Covenant's and APC's Interrogatories and Requests for Production of Documents.

(Doc. 113-3, at 3-4).

Snow acknowledged that Hartford designated him to testify regarding "policies and procedures and relationships to third parties" concerning reimbursements to

---

[1] Snow testified that he could provide only limited information regarding topics 8 and 9. He possessed knowledge of medical reimbursement procedures for worker's compensation claims, but he did not know about non-medical areas of worker's compensation. (Doc. 113-1, at 27-28).

[2] Item 11 encompassed "The H.C.F.A. 1500 forms and supporting documentation provided to Hartford regarding medication administered by APC and Covenant to the individuals at issue in the Amended Complaint." (Doc. 113-3, at 4). Snow testified he did not possess knowledge of that topic, and he deferred to a colleague Defendants also designated pursuant to Rule 30(b)(6). (Doc. 113-1, at 29).

[3] Hartford's attorney clarified that Snow would provide testimony regarding topic 15 insofar as that testimony coincided with the other topics listed in the notice. (Doc. 113-1, at 29).

medical providers, but he deferred testimony regarding the details of processing HCFA 1500 forms to another Hartford employee.   (Doc. 113-1, at 30).   He offered information regarding Hartford's claims against Defendants in this case from "a financial perspective," as the claims relate to alleged overpayments.   (*Id.* at 36).

Defendants' attorney questioned Snow about a group of checks payable to either APC or Covenant that Hartford produced to represent all of its alleged overpayments. (Doc. 113-2, at 155-56).   The upper, left-hand corner of each check, which portrays the payor information, contains either the name "Southeast Workers' Compensation Claims Center" or "Specialized Workers Compensation Claim Center," both of which had mailing addresses at post office boxes in Lexington, Kentucky.   The upper, left-hand corner of each check also contains an emblem of a stag and the name "The Hartford."   (Docs. 113-4, 113-5, 113-6).   Snow confirmed that the name "Hartford Fire Insurance Company" did not appear on the face of any of the checks.   (Doc. 113-2, at 158).

The following exchange then occurred between Snow and Defendants' attorney:

> Q.   Okay, thank you.   So Hartford Fire Insurance Company did not pay for the reimbursements at issue in this lawsuit, correct?

> MR. ZIMMERMAN [Hartford's attorney]:   Object to the form.

> A.   I'm not sure that that's accurate.   Just because it's not appearing on the bill doesn't mean the back-end accounting doesn't have it coming out of that particular writing company's account.

Q.   Okay.   But you would agree with me that based on the face of the Complaint, Hartford Fire Insurance Company did not pay for – I'm sorry.   Based on the face of the checks in Defense Exhibit 10 and Defense Exhibit 11, Hartford Fire Insurance Company did not pay for the reimbursements at issue in this lawsuit, correct?

MR. ZIMMERMAN:   Same objection.

A.   Yes, I don't know how – it does show on there Hartford.

Q.   Correct.   It shows "The Hartford," isn't that correct?

A.   I don't know if it says "the," I think it just says "Hartford."

Q.   It says "The Hartford."

A.   Does it?   Okay, I'm sorry.   No, you're right, it does say "The Hartford," yes.

Q.   And "The Hartford" stands for Hartford Financial Services Group, Inc., correct?

A.   I don't know how all of our legal entities are tied together and how the naming fits together.

Q.   Well, Mr. Snow, you've been designated to testify as to Hartford's corporate structure –

A.   Yes.

Q.   – records, statements, reports, or payments that in any way evidence Hartford overpaying for medications administered by APC or Covenant to the patients at issue in the Amended Complaint, correct?

A.   Yes.

Q.   And we just went over that Defendants' Exhibit 10 and Defendants' Exhibit 11 illustrate the payments made to APC and Covenant that are at issue in this case, correct?

A.   Yes.

Q.   So nowhere on the face of the check is Hartford Financial Insurance – I'm sorry, is Hartford Fire Insurance Company identified as the payor, correct?

A.   Correct.

Q.   So based on the face of the check itself, and all the checks that are at issue in this case for the overpayments, there's no evidence that Hartford Fire Insurance company actually made those payments, correct?

MR. ZIMMERMAN:   Object to the form.

A.   Based on just the face value of the check image itself, yes.

(Doc. 113-2, at 158-61).   Snow testified that he did not offer testimony as the corporate representative for Hartford Financial Services Group, Inc., The Hartford, Southeast Workers' Compensation Claims Center, or Specialized Workers' Compensation Claims Center.   (*Id.* at 162-64).

On October 15, 2020, to support Hartford's response to Defendants' motion for judgment on the pleadings, Snow executed a declaration stating, in relevant part:

2.   I am employed by Hartford [previously referenced as shorthand for Hartford Fire Insurance Company] as Director, WC [Workers Compensation] Medical Bill and Medicare.   I have held that position since October 1, 2011.

3.   Among my responsibilities as Director, WC Medical Bill and Medicare, is the management of Hartford's process for paying medical bills submitted by medical providers for treatment rendered to patients pursuant to Hartford worker's compensation insurance policies.   My

responsibilities include the intake, analysis, determinations, and payment of valid claims.

4.   During the time period when the payments at issue in this case were made, "Southeast Workers' Compensation Claims Center" and "Specialized Workers' Compensation Claims Center" were departments of Hartford.  They were not, [sic] separate entities, but were part of Hartford, the same company that employees [sic] me.  None of this has changed.

5.   During the time of the payments in this case, the claims centers were staffed with Hartford employees, and issued checks on a Hartford bank account regarding Hartford workers' compensation claims for payment.  The listing of the particular claims center on each check in Exhibits 10 and 11 to Hartford's deposition, such as "Southeast Workers' Compensation Claims Center," "Specialized Workers' Compensation Claims Center," or some other department, indicates the department within Hartford to which a check is to be returned or with which a payee should make contact in the event of a problem with the check.  Dividing these functions up between different claims centers helps manage the workload and eliminates the need for a single payment center to manage all payments, all problems that arise, or all communications from all payees.  None of this has changed.

6.   Under Hartford's process for paying medical providers for workers compensation treatment, claims centers such as Southeast Workers' Compensation Claims Center and Specialized Workers' Compensation Claim Center had access to electronic information on Hartford's system regarding payments needed.  This information included payees and the amounts regarding claims for payment for workers' compensation treatment.  The issuance and mailing of the checks was part of an automated and centralized process.  Once Hartford, either internally or through an agent, made decisions whether to pay claims and in what amounts, the automated and centralized process actually issued and sent checks.  None of this has changed.

7.   The payments made to Alabama Pain Center, LLC, and Covenant Pain Therapies Center, LLC, were made through this same

process.   As such, Hartford used its own money to pay the claims involved in this case.

8.   While the operation of the claims centers is not within my responsibilities, the issuance of payments by Hartford's claims centers is part of the workers' compensation process at Hartford, so in that regard, the claims centers' existence and output are part of Hartford's process for paying payment claims such as those submitted by Defendants in this case, and I was prepared to testify to that on August 19, 2020, as Hartford's representative regarding that process.   Where the claims centers are positioned in a Hartford organizational chart and what specific accounts are used for the issuance of checks was not part of what was needed in order to explain the process at issue in this case and provide testimony on the topics I was designated to address in my deposition.

9.   The payments at issue in this case were for treatment rendered pursuant to Hartford workers' compensation insurance policies between Hartford and the employers of the three patients involved.

(Doc. 119-1, ¶¶ 2-9).

## ANALYSIS

### Snow's Affidavit Is Not a Sham

Defendants argue the court should not consider Snow's declaration because it violates the sham affidavit rule, which allows a court to reject an affidavit or declaration "when, without explanation, it flatly contradicts [the affiant's or declarant's] own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously."   *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016) (citing *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986); *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656 (11th Cir. 1984)).   A district court should

12

apply the rule "'sparingly because of the harsh effect it may have on a party's case.'" *Furcron,* 843 F.3d at 1307 (citing *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (in turn quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987))). Thus,

> the rule only operates in a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to those "which create an issue of credibility or go to the weight of the evidence." *Tippens,* at 953; *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012) (stating, "[where] the apparent contradiction derives not from purposeful fabrication but instead from dialectical misunderstanding . . . any apparent contradiction becomes 'an issue of credibility or go[es] to the weight of the evidence'") (alterations in original). Put differently, "[a]n opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose [an] issue of credibility." *Tippens,* at 953. (quoting *Moore's Federal Practice* § 56.15 (2d ed. 1985)) (alterations in original).

*Furcron,* 843 F.3d at 1306-07. The court should not disregard an affidavit or declaration if it "merely 'supplements earlier testimony, presents a variation of testimony or represents instances of failed memory.'" *Otwell v. Alabama Power Co.*, 944 F. Supp. 2d 1134, 1145 (N.D. Ala. 2013), *aff'd*, 747 F.3d 1275 (11th Cir. 2014) (citing *Croom v. Balkwill,* 672 F. Supp. 2d 1280, 1285 (M.D. Fla. 2009)).

The court easily concludes that Snow's declaration does not fall prey to the sham affidavit rule because it does not "flatly contradict" his earlier deposition testimony and does not represent an unexplained discrepancy or inconsistency. During the deposition, Snow responded to circumscribed questions about the entities listed as

13

payors on the face of the checks.  He acknowledged that the words "Hartford Fire Insurance Company" did not appear on the face of the checks, but he did not agree that fact indicated Hartford Fire Insurance Company did not make the payments the checks referenced.  To the contrary, he specifically stated:  "Just because [Hartford Fire Insurance Company is] not appearing on the bill doesn't mean the back-end accounting doesn't have it coming out of that particular writing company's account." (Doc. 113-2, at 158).  Furthermore, the posed questions limited their inquiry to whether the face of the checks identified Hartford Fire Insurance Company as the payor; that fact by itself is not conclusive as to whether Hartford is actually the payor, especially given the existence of controverting facts establishing Hartford as the payor.

To wit, in his subsequent declaration Snow declared that Southeast Workers' Compensation Claims Center and Specialized Workers' Compensation Claims Center constituted departments within Hartford Fire Insurance Company, not separate entities, and that those claims centers issued checks from a Hartford bank account. (Doc. 11-1, ¶¶ 4-5).  Thus, Snow explicated that Hartford Fire Insurance Company made the payments at issue in this suit, despite the fact that its name did not explicitly appear on face of the checks.

Defendants also argue Snow's declaration testimony that Southeast Workers' Compensation Center constitutes a department within Hartford inherently contradicts his previous deposition testimony that he did not testify as the corporate representative

14

of Southeast Workers' Compensation Claims Center.  (*See* Doc. 113-2, at 162).  The court does not find an inherent contradiction.

If Snow declared accurately, the Claims Centers did not constitute juridical entities as they were mere departments of a corporate entity.  By extrapolation, the Claims Centers could not have corporate representatives for Rule 30(b)(6) purposes because they are not suable, subject to legal process, etc.  Therefore, Snow accurately stated in his deposition that he did not testify as the corporate representative of Southeast Workers' Compensation Claims Center because he could not have offered testimony as the corporate representative of non-juridical entities.

For the foregoing reasons, Snow's declaration does not inherently contradict his previous deposition testimony, and the sham affidavit rule does not require the court to disregard Snow's declaration.

### Disputable Issues of Fact Prevent Resolution of Defendants' Motion

According to Defendants, Hartford lacks standing to pursue the claims it asserts in the Amended Complaint because Snow's testimony demonstrates Hartford did not make the alleged overpayments for which it now seeks reimbursement.  The parties dispute the applicability of two different legal doctrines to their motion: "constitutional" standing, which implicates this court's subject matter jurisdiction, and "prudential" standing.

The Eleventh Circuit delineates "constitutional" standing in *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255 (11th Cir. 2015):

> "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). Accordingly, standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* A litigant is so entitled only when he has "such a personal stake in the outcome of the controversy to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr,* 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663 (1962). A plaintiff must meet three requirements in order to establish Article III standing: injury in fact — "a harm that is both concrete and actual or imminent, not conjectural or hypothetical," causation — "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant," and redressability — "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 771, 120 S. Ct. 1858, 1861-62, 146 L. Ed. 2d 836 (2000) (internal quotation marks, citations and alterations omitted).

*Yellow Pages Photos, Inc.*, 795 F.3d at 1264-65 (alteration and ellipsis in original).

The so-called prudential standing doctrine provides that "a litigant ordinarily 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Id.* at 1265 (quoting *Warth,* 422 U.S. at 499); *see also Bank of Am. Corp. v. City of Miami, Fla.*, – U.S. – , 137 S. Ct. 1296, 1302 (2017) ("This Court has also referred to a plaintiff's need to satisfy 'prudential' or 'statutory' standing requirements. . . . In [*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572

U.S. 118 (2014)], we said that the label 'prudential standing' was misleading, for the requirement at issue is in reality tied to a particular statute. . . . The question is whether the statute grants the plaintiff the cause of action that he asserts.") (citations omitted); *Lexmark*, 572 U.S. at 127 n. 3 ("[T]hird-party [prudential] standing is 'closely related to the question whether a person in the litigant's position will have a right of action on the claim . . . .") (citation omitted); *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1274 n. 6 (11th Cir. 2018) ("Under *Lexmark*, the question [regarding prudential or statutory standing] is whether Plaintiffs have a valid cause of action . . . .") (citation omitted).[4] "This 'general prohibition on a litigant's raising another person's legal rights' is a 'prudential standing' doctrine, 'not derived from Article III.'" *Yellow Pages*, 795 F.3d at 1265 (quoting *Lexmark,* 572 U.S. at 126; *Newton*, 895 F.3d at 1274 n. 6) ("The Supreme Court's decision in *Lexmark* . . . effectively abolished prudential standing (sometimes referred to as statutory standing) as a jurisdictional doctrine that would give rise to a Rule 12(b)(1) dismissal without prejudice.") (citation omitted).

---

[4] Notwithstanding Hartford's remonstrations, Defendant couched its dispute as whether Hartford is asserting its own legal rights and interests as a matter of prudential standing, not Federal Rule of Civil Procedure 17's real party in interest inquiry. (Doc. 113 at 10). In Hartford's favor, the court understands the digression as there exists an overlap between the two concepts. 6A Fed. Prac. & Proc. Civ. § 1542 (discerning overlap between real party in interest standard and prudential standing), *cited in, Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017) ("[T]here is a key jurisdictional distinction between a challenge that a plaintiff lacks Article III standing and one that she is not the real party in interest. The latter presents a merits question: 'who, according to the governing substantive law, is entitled to enforce the right?' . . . It is thus like contractual or statutory standing and does not go to a court's subject matter jurisdiction.").

Based upon the contentions presented in Defendants' Motion, there exist genuine issues of fact which cannot be resolved at this stage of the litigation, particularly because the jurisdictional standing issue presents questions of fact intertwined with the merits of this case.   The Eleventh Circuit establishes particular modes of review for Rule 12(b)(1) challenges to subject matter jurisdiction:

> [A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint.   If the challenge is facial, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised . . .   Accordingly, the court must consider the allegations in the plaintiff's complaint as true . . .
>
> A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion . . . Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered.   Furthermore, . . . the district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing, *inter alia*, *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (internal quotation marks and alterations omitted).

Therefore, a factual challenge to subject matter jurisdiction typically permits a "trial court . . . to weigh the evidence and satisfy itself as to the existence of its power

18

to hear the case." *Williamson*, 645 F.2d at 412-13.   No presumptive truthfulness would attach to a plaintiff's claims, and "the existence of disputed material facts [would] not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id*; *see also Lawrence*, 919 F.2d at 1528-29.

Nevertheless, contrasting evidentiary showings do not permit resolution of standing issues on a bare record.   A "district court *cannot* decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone but *must* hold an evidentiary hearing. . . . [W]hen determining standing, a district court should resolve disputed factual issues either at a pretrial evidentiary hearing or at trial." *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 879 (11th Cir. 2000) (citing *Steele v. National Firearms Act Branch*, 755 F.2d 1410 (11th Cir. 1985)). "Thus, in a case where the evidence relating to standing is squarely in contradiction as to central matters *and* requires credibility findings, a district court cannot make those findings simply by relying on the paper record but must conduct a hearing at which it may evaluate the live testimony of the witnesses." *Id.* at 881.

As declared, the evidence presented by the parties on the standing issue reveals disputed issues of fact as to whether Hartford satisfies the doctrine.   Snow offered sworn testimony that the checks representing all disputed payments in this case drew from Hartford accounts.   That testimony refutes Defendants' argument that an entity other than Hartford made the contested payments.

19

Indeed, Snow's deposition testimony alone reveals the issues of fact awaiting resolution at an appropriate evidentiary proceeding.   Snow's testimony establishes that Hartford's name does not appear on the face of the checks that reflect the disputed payments.   Nonetheless, Snow explicitly stated during the deposition that the absence of the words "Hartford Fire Insurance Company" on the face of the checks did not conclusively establish that an entity other than Hartford made the payments.   (*See* Doc. 113-2, at 158 ("Just because it's not appearing on the bill doesn't mean the back-end accounting doesn't have it coming out of that particular writing company's account.")). He also alluded to the existence of various claims centers within Hartford that process claims payments.   (*See id.* at 164).   Therefore, even Snow's deposition testimony, standing alone, fails to conclusively establish that Hartford did not make the disputed payments.[5]

In addition, the standing inquiry's factual determination is intertwined with the merits of this case, including the prudential standing inquiry, i.e., whether Hartford asserts its own legal rights and interests.   A different standard arises when a defendant's factual attack on subject matter jurisdiction enmeshes an element of a plaintiff's cause

---

[5] Defendants suggest Hartford may have failed in its Rule 30(b)(6) duty to present a corporate representative who could adequately testify regarding the designated topics (Doc. 121, at 5-7), and Hartford suggests Defendants should have filed a motion challenging Snow's designation pursuant to Rule 37(a)(3)(B)(ii).   (Doc. 119, at 6 n.3).   The court does not consider those issues ripe for resolution in conjunction with the present motion.   No Rule 37 motion currently pends before the court, and the court stayed all discovery, which previously operated under a January 25, 2021, deadline, pending a ruling on the motion for judgment on the pleadings.   (*See* Docs. 102, 116).   The parties will now have the opportunity to correct any remaining evidentiary deficiencies through continued discovery.

of action, and thus, "the attack on jurisdiction is also an indirect attack on the merits." *Lawrence*, 919 F.2d at 1530.  When "the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction."  *Id.* at 1530 (citing *Williamson*, 645 F.2d at 415-16).

Determining whether Hartford is the payor on the Defendants' claim reimbursements not only involves the inquiry whether it suffered an injury for Article III standing purposes; such determination also incites the inquiry whether Hartford asserts its own legal rights and interests vis-à-vis the prudential standing inquiry. Furthermore, the issue whether Hartford is the payor implicates the merits of some of its claims.

For example, the money paid by mistake and unjust enrichment claims (which are synonymous) assess whether "a plaintiff can prove facts showing that defendant *holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud." *Dickinson v. Cosmos Broad. Co.*, 782 So. 2d 260, 266 (Ala. 2000) (citations omitted).  Thus, to prove those claims, Hartford would have to establish that the money paid to the Defendants on the claims reimbursements belongs to it or was paid by it because of mistake or fraud, which, of course, mirrors whether Hartford was the payor suffering an injury. Likewise, the fraud claims require Hartford to prove that it suffered an actual injury by

21

relying upon false representations regarding material facts. *Aliant Bank, a Div. of US Ameribank v. Four Star Investments, Inc.*, 244 So. 3d 896, 928 (Ala. 2017) (citing *Boswell v. Liberty Nat'l Life Ins. Co.*, 643 So.2d 580, 581 (Ala. 1994)).   Again, proving an injury vis-à-vis the fraud claim envelopes the standing doctrine's injury-in-fact requirement.

Suffice to say, the court has already described the existence of genuine issues of disputed fact that warrant denial of Defendants' motion pursuant to the summary judgment standard.[6]   Therefore, resolution of these issues awaits presentation at an evidentiary hearing, or more likely, trial, unless a subsequent summary judgment motion demonstrates the issue may be pursued on the record.

## CONCLUSION

Based on the foregoing analyses, the court **DENIES** Defendants' motion for judgment on the pleadings.   The court **DENIES** as moot Plaintiff's motion for oral

---

[6] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. Rule 56(a).  The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "Thus, although a court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citing 9A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2529 (2d ed. 1995) [now 9B C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2529 (3d ed. 2018)]).  "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151 (citing 9A Wright & Miller at § 2529).

argument.   (Doc. 128).   The court **LIFTS** the stay on discovery and will enter a revised scheduling order contemporaneously.

**DONE** and **ORDERED** this 28th day of December, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE